**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | |
|---|---|
| **ELEVANCE HEALTH, INC.,**<br><br>                    **Plaintiff,**<br><br>**v.**<br><br>**DR. WALDEMAR C. RÍOS ALVAREZ,**<br>**DR. BENJAMIN GUARDIOLA, JAIME**<br>**RIVERA PESANTE, DR. SARA RAMOS**<br>**GONZALEZ,**<br><br>                    **Defendants.** | **Case No.: 1:26-cv-199** |

**COMPLAINT**

Plaintiff Elevance Health, Inc. ("Elevance Health"), by counsel, hereby states the following as its Complaint against Dr. Waldemar C. Ríos Alvarez ("Dr. Ríos"), Dr. Benjamin Guardiola ("Dr. Guardiola"), Jaime Rivera Pesante ("Mr. Rivera"), and Dr. Sara M. Ramos Gonzalez ("Dr. Ramos") (collectively the "Former Executives" or "Defendants"):

**PRELIMINARY STATEMENT**

In this action, Elevance Health seeks to recover the value of equity awards it made to the Former Executives under a series of Restricted Stock Unit Award Agreements (the "RSU Agreements"), Nonqualified Stock Option Award Agreements (the "Option Agreements"), and Performance Stock Unit Award Agreements (the "PSU Agreements") (collectively, the "Agreements").[1]  The Former Executives, who worked as senior leadership of Elevance Health

---

[1] Copies of the Dr. Ríos March 3, 2025, RSU Agreement, Option Agreement, and PSU Agreement are attached as **Exhibits A-C**, respectively. The pertinent parts of Exhibits A-C are identical to, and will be referenced herein as an exemplar for, all Former Executives.

Puerto Rico, received lucrative payments of equity during their respective periods of employment, which, in the case of Dr. Ríos, had a cash value exceeding $900,000.

The payment of equity was subject to certain conditions, which were consistent with the Former Executives' level of seniority and exposure to Elevance Health's confidential information. Among these conditions was an agreement to refrain from limited forms of post-employment competition with Elevance Health for a short 12-month duration. Under the express terms of the Agreements, if the Former Executives chose to unfairly compete with Elevance Health in violation of these restrictions, they would be required to forfeit and remit the value of the foregoing benefits.

With knowledge of these conditions, the Former Executives knowingly breached their obligations when, after resigning between August and December 2025, each of them quickly assumed a comparable executive position at Triple-S Salud, Inc. ("Triple-S"). Triple-S is the largest health insurance company in Puerto Rico and is Elevance Health Puerto Rico's primary competitor on the island. In these new positions, each of the Former Executives is performing the same or similar job duties, and is likely to disclose confidential information they obtained during their employment, all in violation of their Agreements.

Upon discovering the Former Executives' new roles at Triple-S, Elevance Health requested repayment of the value of the equity awards they received, and which they forfeited by and through their breaches. Each of them dismissed Elevance Health's requests, thereby necessitating this action. Now, Elevance Health petitions the Court to order the Former Executives to return the value of their respective equity awards under the terms of the Agreements and to award Elevance Health its costs, fees, and expenses incurred in this action.

## PARTIES AND PERTINENT NON-PARTIES

1.      Plaintiff Elevance Health is an Indiana corporation, with its principal place of business in Indianapolis, Indiana. Elevance Health is in the business of offering health insurance plans and services, including medical, pharmaceutical, dental, behavioral health, long-term care, and disability plans. Elevance Health issued and administered the Agreements and the related stock grants from its headquarters in Indianapolis, Indiana.

2.      Non-Party The Elevance Health Companies of Puerto Rico, LLC ("Elevance Health Puerto Rico") is a wholly owned subsidiary of Elevance Health and employed each of the Former Executives prior to their respective resignations.

3.      Upon information and belief, Dr. Waldemar Ríos Alvarez is a citizen of the Commonwealth of Puerto Rico and was employed by Elevance Health Puerto Rico from June 2021 until he resigned in August 2025.

4.      Upon information and belief, Dr. Guardiola is a citizen of the Commonwealth of Puerto Rico and was employed by Elevance Health Puerto Rico from June 2021 until he resigned in September 2025.

5.      Upon information and belief, Mr. Rivera is a citizen of the Commonwealth of Puerto Rico and was employed by Elevance Health Puerto Rico from June 2021 until he resigned in September 2025.

6.      Upon information and belief, Dr. Ramos is a citizen of the Commonwealth of Puerto Rico and was employed by Elevance Health Puerto Rico from June 2021 until she resigned in December 2025.

7.      Non-Party Triple-S is a company which claims to be "the leader in health insurance and the largest health insurance company in Puerto Rico."[2] Triple-S is a direct competitor of Elevance Health Puerto Rico, including by providing competing Medicare Advantage, Medicare, and Medicaid plans, as well as clinical, pharmaceutical, pre-authorization, and administrative services for medical groups.

JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over the Former Executives because they agreed to submit to the exclusive jurisdiction and venue of the federal or state courts of Indiana to resolve any and all issues that may arise out of or related to the 2017 Elevance Health Incentive Compensation Plan (June 2022 Restatement) (the "Plan") or any related Award Agreement, as set forth in pertinent part below:

> Unless otherwise provided in the Award Agreement, Participants are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of Indiana, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement.

*See* Plan § 20.11, a copy of which is attached as **Exhibit D**.

9.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 with respect to the claims against Dr. Ríos, Mr. Rivera, and Dr. Guardiola because the parties are citizens of different states and the amount in controversy exceeds $75,000.

10.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Elevance Health's claim for breach of contract against Dr. Ramos (Count IV). The foregoing count of the Complaint is so related to the claims against the remaining Former Executives that

---

[2]*See* https://salud.grupotriples.com/en/about-us/ (last visited January 24, 2026).

they form part of the same case or controversy under Article III of the United States Constitution.

11.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred here and the Former Executives consented to venue in this Court. *See* Ex. D, § 20.11.

FACTS

12.    Elevance Health is a market leading health care company that offers a range of health plans and insurance benefits, including but not limited to, network-based managed care risk-based plans to the Individual, Employer Group, Medicaid and Medicare markets, level-funded health plans, and third-party administrative services.

13.    Elevance Health is a publicly traded company listed on the New York Stock Exchange and, since 2017, has adopted an incentive plan (the Plan) under which shares are distributed to certain employees of Elevance Health or its affiliated and subsidiary companies, subject to certain conditions and restrictions.

14.    Elevance Health Puerto Rico is a wholly owned subsidiary of Elevance Health that carries out Elevance Health's business and services the Puerto Rico market.

**A.  Elevance Health's Equity Awards Under the 2017 Plan**

15.    Certain executives and senior employees of Elevance Health and its affiliates are eligible to receive equity incentives under the 2017 Elevance Health Incentive Compensation Plan (June 2022 Restatement) (the "Plan"), including shares (stock options, restricted stock units, and performance stock units) of Elevance Health stock, which provides them substantial compensation over and above their normal pay. These awards represent additional benefits to which the employees—which are referred to in the Plan as "Participants"—are not automatically

entitled, except if they comply with specific requirements of the Agreements. Employees are under no obligation to execute the Agreements.

16.     The equity awards under the Plan were, and are, solely for executives and key employees of Elevance Health and its affiliates.

17.     Each share issued to a Participant under the Plan represents a substantial amount of money the Participant would not otherwise have received. In recent years, Elevance Health's stock (NYSE: ELV) has traded between $300-$400 per share.

18.     Due to their senior positions, significant responsibilities, and access to Elevance Health Confidential Information and trade secrets, Participants possess knowledge that could be unfairly used by or for the benefit of a competitor. Accordingly, equity awards under the Plan are conditioned on the Participant's execution of applicable agreements that include reasonable confidentiality, non-competition, and non-solicitation provisions.

19.     For example, between 2021-2025, Dr. Ríos and Elevance Health entered into stock option, restricted stock unit, and performance stock unit award agreements that contained confidentiality, non-compete, and non-solicitation provisions.

20.     Most recently, on March 3, 2025, Elevance Health awarded Dr. Ríos with a series of restricted stock units, performance stock units, and stock options (collectively, the "Stock Grants"), which were conditioned upon Dr. Ríos's acceptance of attached award agreements (the Agreements), copies of which are attached hereto as Exhibit A-C.[3]

21.     All of the Former Executives likewise received Stock Grants on or about March 3, 2025, containing restrictions identical to those in the Ríos Agreements attached as Exhibits A-C.

---

[3] The pertinent provisions of Exhibits A–C are identical with respect to Non-Competition (Section 7) and Return of Consideration (Section 8). Accordingly, for brevity, Elevance Health refers only to Exhibit A.

22.     The benefits under the Agreements were contingent on the Former Executives' agreement to abide by certain conditions.

23.     The Former Executives each agreed that for a period of twelve (12) months following termination of their respective employment they would not, without prior written consent of Elevance Health: (i) obtain a "Competitive Position" within the "Restricted Territory" for a "Competitor"; or (ii) perform a "Restricted Activity" within the Restricted Territory for a Competitor.[4] Ex. A, § 7(b).

24.     "Competitive Position" means any employment or performance of services with a Competitor (A) the same as or similar to the services that Participant performed for the Company in the last twenty-four (24) months of Participant's employment with Company (the "Look Back Period"), or (B) in the performance of which Participant will likely use any Confidential Information of the Company. Ex. A, § 7(b)(i).

25.     "Restricted Territory" means any geographic area in which the Company does business and which Participant provided services in, had responsibility for, had a material presence or influence in, or had access to Confidential Information about, such business, within the Look Back Period. Ex. A, § 7(b)(ii).

26.     For each of the Former Executives, the Restricted Territory covered Puerto Rico.

27.     "Restricted Activity" means any activity for which Participant had responsibility for the Company or about which Participant had Confidential Information within the Look Back Period. Ex. A, § 7(b)(iii).

28.     "Competitor" is defined in the Agreements to mean:

---

[4] Unless otherwise defined herein, capitalized terms have the same meaning as set forth in the Agreements.

any entity or individual (other than the Company) engaged in any one or more of the following: management of network-based managed care plans and programs; administration of managed care services; provision of health insurance, long-term care insurance, dental, life, or disability insurance; administration of flexible spending accounts, COBRA continuation coverage, coordination of benefits, or subrogation services; or the provision, delivery, or administration of health benefit plans or health care services such as pharmacy benefits management (including Specialty pharmacy), value-based care delivery, behavioral health, palliative care, care for chronic and complex conditions, digital healthcare platforms, medical benefits management solutions, or health care research (including health economics and outcomes); or any other aspects of the business or products or services offered by the Company, as to which Participant had responsibilities or received Confidential Information about, during the Look Back Period.

*Id.* at § 7(b)(iv).

29.     Triple-S is a "Competitor," as defined by the Agreements. It is a company engaged in several practices and sells products that compete directly with Elevance Health Puerto Rico. For example, and without limitation, Triple-S is a "Competitor" because it offers Medicare Advantage, Medicare, and Medicaid plans, as well as clinical, pharmaceutical, pre-authorization, and administrative services for medical groups, in direct competition with Elevance Health Puerto Rico. See Ex. A, § 7(b)(iv).

30.     The Former Executives further agreed that, if they chose to leave and unfairly compete against Elevance Health in violation of Section 7(b), the value of the equity they received was subject to forfeiture under Section 8 of the Agreements, entitled "Return of Consideration."

31.     By its terms, the forfeiture provisions in Section 8 of the Agreements apply not only to equity granted in the Agreements themselves, but also to any award of equity that any Former Executive received from Elevance Health under a prior equity incentive plan (defined in the Agreement as a "Designated Plan"). *See Id.* at § 8(c).

32.     If any of the Former Executives breached the Agreement, including Section 7(b) thereof, the Former Executives each agreed to repay Elevance Health the value of any equity that

8

vested or stock options that were exercised within the 24 months immediately preceding the breach. The Agreements state the following in pertinent part:

> Participant shall pay to the Company (A) for each share of common stock of the Company ("Common Share") acquired on exercise of an option under a Designated Plan within the 24 months prior to such breach, the excess of the fair market value of a Common Share on the date of exercise over the exercise price, and (B) for each share of restricted stock, restricted stock unit and/or performance stock unit that became vested under any Designated Plan within the 24 months prior to such breach, the fair market value (on the date of vesting) of a Common Share.
>
> Any amount to be repaid pursuant to this Section 8 shall be held by Participant in constructive trust for the benefit of the Company and shall, upon written notice from the Company, within 10 days of such notice, be paid by Participant to the Company.

Ex. A, § 8(a)(iii).

33.     Moreover, amounts repayable under Section 8 "are determined on a gross basis, without reduction for any taxes incurred or withheld, as of the date of the realization event, and without regard to any subsequent change in the fair market value of a Common Share." *Id.* at § 8(b).

34.     Section 8 of the Agreements provided the Former Executives with a choice: abide by the promises made in the Agreements and avoid the forfeiture provisions of Section 8. Alternatively, if they chose to leave their employment and unfairly compete with Elevance Health and/or its affiliates, in violation of Section 7(b), they must repay the value of the equity awards received, according to the terms of the Agreements.

35.     The Agreements, including the restrictions in Section 7, applied to any affiliate of Elevance Health to which the Former Executives provided services or about which they received Confidential Information, including The Elevance Health Companies of Puerto Rico, LLC. *See Id.* at § 9(g).

**B. Dr. Ríos's Employment with Elevance Health Puerto Rico and Subsequent Breach of the Agreements.**

36.     On June 28, 2021, Elevance Health Puerto Rico acquired MSO of Puerto Rico, LLC ("MSOPR") a company that is a key participant in the Puerto Rico health insurance market. Services handled under an MSO, or managed services organization, often include billings, managed care, inpatient services, care management, pharmacy, and credentialing.

37.     At the time of the acquisition, Dr. Ríos served as Chief Medical Officer ("CMO") for MSOPR. Following the acquisition, Dr. Ríos became employed by Elevance Health Puerto Rico and, beginning in 2024, Dr. Ríos held the position of Staff VP Medical Director, MSO, which was a role at the Vice President level. After the acquisition, Dr. Ríos continued to oversee for Elevance Health Puerto Rico the same business activities that he oversaw for MSOPR, including billings, managed care, inpatient services support, regulatory and compliance, and pharmacy.

38.     Specifically, in his position within Elevance Health Puerto Rico, Dr. Ríos was responsible for the comprehensive administration of medical services for the company's health plans, encompassing clinical performance management, interpretation and development of policies in accordance with changes in the health and pharmacy sectors, and the direction of clinical and non-clinical activities impacting the quality, cost, and outcomes of healthcare. The role included ensuring timely responses to members and providers, identifying innovative opportunities, serving as a resource and representative before internal and external committees, and overseeing the hiring, training, and evaluation of assigned staff.

39.     Additionally, Dr. Ríos exercised strategic executive leadership across the Medicare and Medicaid business lines throughout Puerto Rico; developed and executed the pharmaceutical strategy with direct oversight of all pharmacy-related operations from a clinical

perspective; supervised operations in patient clinics and utilization management; and directly led pharmaceutical strategy, acting as an expert in clinical policies.

40.     Dr. Ríos was also responsible for clinical supervision and leadership over all physicians and directors within the MSO operations.

41.     While serving as Staff VP Medical Director, MSO at Elevance Health Puerto Rico, Dr. Ríos had access to confidential information related to the company's marketing strategies for Puerto Rico, its pricing and cost structures, quotes, short- and long-term business strategies, negotiations with distributors, financial information relevant to Elevance Health's business, as well as access to patient and personnel files.

42.     Moreover, during his employment with Elevance Health Puerto Rico, Dr. Ríos was instrumental in developing its multi-disciplinary clinics, a significant competitive advantage that Elevance Health Puerto Rico has over its competitors in the Puerto Rico market. Unlike other health plans in Puerto Rico, Elevance Health Puerto Rico offers multi-disciplinary clinics where patients can access specialists, such as endocrinologists and pharmacists, as well as emergency rooms. Developing multi-disciplinary clinics requires extensive knowledge of the requirements for the various specialties, the infrastructure and equipment needed for each specialty, the staffing requirements, and any applicable regulations.  Dr. Ríos's expertise in this area, developed over years with Elevance Health Puerto Rico, was a significant asset to the business.

43.     During his employment with Elevance Health Puerto Rico, Dr. Ríos received 16 separate equity awards from Elevance Health, four in 2021, three in 2022, three in 2023, three in 2024, and three in 2025. Each award agreement contained similar restrictive covenants and required Dr. Ríos to repay the equity awards if he materially breached any provisions therein.

44.    On August 8, 2025, Dr. Ríos resigned from his employment with Elevance Health Puerto Rico.

45.    Immediately following his resignation, Dr. Ríos began employment with Triple-S, a direct competitor of Elevance Health Puerto Rico, as its Chief Medical Officer.

46.    In his role as Chief Medical Officer for Triple-S, Dr. Ríos is responsible for, among other things, the creation and execution of medical policy, the development of pharmacy strategy and the integration of pharmacy strategy with medical policy and quality programs. He also supervises clinical operations, care management programs, and utilization management programs. Moreover, he has direct responsibility for clinical quality oversight and compliance with regulatory requirements. He also provides leadership across Triple-S's Medicare and Medicaid lines of business. All these activities are the "same or similar" to services he provided for Elevance Health Puerto Rico.

47.    Dr. Ríos's employment with Triple-S is both (i) a Competitive Position within the Restricted Territory for a Competitor; and (ii) a Restricted Activity within the Restricted Territory for a Competitor, resulting in independent material breaches of § 7(b) of the Agreements.

48.    First, Dr. Ríos's work for Triple-S is a "Competitive Position" because it is a position of employment with a Competitor where he performs the "same or similar services" to what he performed for Elevance Health in the last 24 months prior to her resignation. *Id.*

49.    Second, Dr. Ríos's work for Triple-S is also a "Competitive Position" for the independent reason that it is a position of employment with a Competitor where Dr. Ríos is likely to use Elevance Health's Confidential Information. *Id.*

50.     Moreover, by serving as a senior executive for Triple-S, Dr. Ríos is engaging in a Restricted Activity because he is engaging in activities for which he "had responsibility for [Elevance Health Puerto Rico]" and "about which [he] had Confidential Information within the Look Back Period." *See* Ex. A, § 7(b)(iii).

51.     Furthermore, Dr. Ríos's obtaining of the Competitive Position and performance of the Restricted Activity are both occurring within the Restricted Territory – Puerto Rico.

52.     Without limitation, Elevance Health disclosed its Confidential Information to Dr. Ríos, including critical and confidential information related to marketing strategies for Puerto Rico, pricing and cost structures, quotes, short- and long-term business strategies, negotiations with distributors, financial information relevant to Elevance Health's business, strengths and weaknesses of the operational framework, as well as access to the company's patient files.

53.     Considering Dr. Ríos's position within Elevance Health Puerto Rico and his access to Elevance Health's confidential information, his employment with Triple-S presents a significant threat of unfair competition, which is the very threat Elevance Health sought to address in the Agreements through the restrictions in Section 7.

54.     During his employment with Elevance Health Puerto Rico, Dr. Ríos received more than $904,222.58 in equity awards, which were provided as an incentive to prevent Dr. Ríos from unfairly competing with Elevance Health for 12 months after the termination of his employment.

55.     Elevance Health made good-faith efforts to resolve this dispute by communicating in writing with Dr. Ríos on more than one occasion; those efforts were unsuccessful.

56.     Pursuant to Section 8(a)(iii) of the Agreements, Dr. Ríos must repay and reimburse Elevance Health the following amounts, which represent the Stock Options he

exercised and the RSUs and PSUs in which he vested during the 24 months immediately

preceding his breach of Section 7(b):

| Stock Options | | | | | | |
|---|---|---|---|---|---|---|
| Grant Date | Exercise Date | Share Price at Exercise | Exercise Price | Spread (per share) | Options Exercised | Amount Realized |
| 8/2/2021 | 2/29/2024 | $501.25 | $390.29 | $110.96 | 173 | $19,196.08 |
| 3/1/2022 | 2/29/2024 | $501.25 | $451.50 | $49.75 | 72 | $3,582.00 |
| 3/1/2022 | 3/4/2024 | $504.36 | $451.50 | $52.86 | 73 | $3,858.78 |
| 3/1/2023 | 3/4/2024 | $504.36 | $469.03 | $35.33 | 68 | $2,402.44 |
| 8/2/2021 | 8/6/2024 | $523.68 | $390.29 | $133.39 | 87 | $11,604.93 |
| | | | | | Total (Options) | $40,644.23 |

| Restricted Stock Units (RSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 3/1/2022 | 3/1/2024 | 37 | $499.11 | $18,467.07 |
| 3/1/2023 | 3/1/2024 | 35 | $499.11 | $17,468.85 |
| 8/2/2021 | 8/2/2024 | 1,282 | $535.17 | $686,087.94 |
| 8/2/2021 | 8/2/2024 | 43 | $535.17 | $23,012.31 |
| 3/1/2022 | 3/1/2025 | 37 | $395.50 | $14,633.50 |
| 3/1/2023 | 3/1/2025 | 36 | $395.50 | $14,238.00 |
| 3/1/2024 | 3/1/2025 | 33 | $395.50 | $13,051.50 |
| | | | Total (RSUs) | $786,959.17 |

| Performance Stock Units (PSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 8/2/2021 | 8/2/2024 | 104 | $535.17 | $ 55,657.68 |
| 3/1/2022 | 3/1/2025 | 53 | $395.50 | $20,961.50 |
| | | | Total (PSUs) | $76,619.18 |

57.    On December 5, 2025, Elevance Health sent a letter to Dr. Ríos requesting said

payment within a ten (10) day period. As of the filing of this Complaint, however, Dr. Ríos has

not made any payment of the amounts owed pursuant to Section 8 of the Agreements.

58.    Dr. Ríos's actions constitute clear, deliberate, and intentional violations of the

contractual obligations he assumed under the Agreements. This breach not only demonstrates a

conscious disregard for the agreed terms but also evidences conduct aimed at gaining a competitive advantage to the direct detriment of Elevance Health.

**C. Dr. Guardiola's Employment with Elevance Health Puerto Rico and Subsequent Breach of His Agreements.**

61.     Like Dr. Ríos, Dr. Guardiola began working for Elevance Health Puerto Rico after its June 2021 acquisition of MSOPR.

62.     While employed by Elevance Health Puerto Rico, Dr. Guardiola held the title of Manager, Medical Director of Inpatient. In this role he served as the medical director for Elevance Health's inpatient services business, which oversees and manages insureds' hospitalizations and inpatient admissions. Whenever an insured would be admitted to the hospital or emergency room, Dr. Guardiola's unit would manage and evaluate the admission, monitor patient charts, review and approve the strategy for treatment, and ensure prescribed treatments are administered. Dr. Guardiola provided medical expertise and oversight for this team. Dr. Guardiola also helped develop and implement policies and procedures.

63.     Dr. Guardiola had access to critical and confidential information related to Elevance Health's inpatient services business, including its short- and long-term business strategies, policies, and procedures.

64.     Moreover, during his employment Dr. Guardiola helped expand Elevance Health's inpatient services business and develop its policies and procedure.

65.     During his employment, Dr. Guardiola received 15 separate equity awards, three in 2021, three in 2022, three in 2023, three in 2024, and three in 2025.

66.     Dr. Guardiola resigned from his employment with Elevance Health Puerto Rico in September 2025. Shortly thereafter, he began employment with Triple-S as its Associate Chief Medical Officer.

67.    In this new role, Dr. Guardiola is performing many of the same duties that he performed for Elevance Health Puerto Rico. For example, Dr. Guardiola is still providing medical expertise and oversight for utilization management decisions, including overseeing hospital utilization review, care management programs, peer review, and compliance and regulatory frameworks. Additionally, Dr. Guardiola's new position directly supervises physicians who support clinical operations. These duties closely mirror the responsibilities Dr. Guardiola had in his position with Elevance Health Puerto Rico.

68.    Dr. Guardiola's employment with Triple-S is both (i) a Competitive Position within the Restricted Territory for a Competitor; and (ii) a Restricted Activity within the Restricted Territory for a Competitor, resulting in independent material breaches of § 7(b) of the Agreements.

69.    Dr. Guardiola's work for Triple-S is a "Competitive Position" because it is a position of employment with a Competitor where he performs the "same or similar services" to what he performed for Elevance Health in the last 24 months prior to his resignation. (*Id.*)

70.    In Dr. Guardiola's new position with Triple-S, he is performing all or substantially all of the same functions he performed for Elevance Health Puerto Rico.

71.    Second, Dr. Guardiola's work for Triple-S is also a "Competitive Position" for the independent reason that it is a position of employment with a Competitor where Dr. Guardiola is likely to use Elevance Health's Confidential Information. (*Id.*) Without limitation, Elevance Health disclosed its Confidential Information to Dr. Guardiola regarding every aspect of its inpatient services business, including its short- and long-term business strategies, policies, procedures, employee staffing and recruiting plans, and employee confidential information.

72.     Moreover, by serving as a senior executive for Triple-S, Dr. Guardiola is engaging in a Restricted Activity because he is engaging in activities for which he "had responsibility for [Elevance Health Puerto Rico]" and "about which [he] had Confidential Information within the Look Back Period." *See* Ex. A, § 7(b)(iii).

73.     Furthermore, Dr. Guardiola's obtaining of the Competitive Position and performance of the Restricted Activity are both occurring within the Restricted Territory – Puerto Rico.

74.     Considering Dr. Guardiola's position within Elevance Health Puerto Rico and his access to Elevance Health's confidential information, his employment with Triple-S presents a significant threat of unfair competition, which is the very threat Elevance Health sought to address in the Agreements through the restrictions in Section 7.

75.     Additionally, during his employment with Elevance Health Puerto Rico, Dr. Guardiola received more than $87,242.22 in equity awards, which were provided as an incentive to induce Dr. Guardiola to refrain from unfairly competing with Elevance Health for 12 months after the termination of his employment. Dr. Guardiola willfully breached the Agreements when he resigned and accepted employment with Triple-S.

76.     Pursuant to Section 8(a)(iii) of the Agreements, Dr. Guardiola must repay and reimburse Elevance Health the following amounts, which represent the RSUs and PSUs in which he vested during the 24 months immediately preceding his breach of Section 7(b):

| Restricted Stock Units (RSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 9/1/2021 | 9/3/2024 | 21 | $562.29 | $11,808.09 |
| 3/1/2022 | 3/1/2024 | 17 | $499.11 | $8,484.87 |
| 3/1/2022 | 3/1/2025 | 17 | $395.50 | $6,723.50 |
| 3/1/2023 | 3/1/2024 | 16 | $499.11 | $7,985.76 |
| 3/1/2023 | 3/1/2025 | 16 | $395.50 | $6,328.00 |
| 3/1/2024 | 3/1/2025 | 21 | $395.50 | $8,305.50 |

| | | | Total (RSUs) | $49,635.72 |
|---|---|---|---|---|

| Performance Stock Units (PSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 9/1/2021 | 9/3/2024 | 50 | $562.29 | $28,114.50 |
| 3/1/2022 | 3/1/2025 | 24 | $395.50 | $9,492.00 |
| | | | Total (PSUs) | $37,606.50 |

77.    On December 5, 2025, Elevance Health sent a letter to Dr. Guardiola requesting said payment within a ten (10) day period. As of the filing of this Complaint, however, Dr. Guardiola has not made any payment of the amounts owed pursuant to Section 8 of the Agreements.

78.    Dr. Guardiola's actions constitute clear, deliberate, and intentional violations of the contractual obligations he assumed under the Agreements. This breach not only demonstrates a conscious disregard for the agreed terms but also evidences conduct aimed at gaining an unfair competitive advantage to the direct detriment of Elevance Health.

**D.  Mr. Rivera's Employment with Elevance Health Puerto Rico and Subsequent Breach of His Agreements.**

78.    Mr. Rivera also joined Elevance Health following the June 2021 acquisition of MSOPR, where he served as Chief Financial Officer ("CFO").

79.    As CFO of Elevance Health's Puerto Rico MSO, Mr. Rivera oversaw all aspects of the MSO's finances, including but not limited to its financial operations, budgeting, reporting, forecasting, managing compensation models for providers, and the MSO's overall financial condition.

80.    During his employment with Elevance Health Puerto Rico, Mr. Rivera had access to critical and confidential information, including all the MSO's financial reports, budgets, provider and insurer contracts, financial models, and forecasts. Mr. Rivera had access to financial information regarding the MSO's providers, their performance results, and their

confidential compensation models. This confidential information helps Elevance Health Puerto Rico compete with the other large provider networks in Puerto Rico and would be of significant value to Elevance Health's competitors, if known to them.

81.    For example, Elevance Health Puerto Rico's compensation models for providers integrate performance metrics that Elevance Health uses to incentivize providers to maximize the quality of services provided to patients. Mr. Rivera was very familiar with these compensation models and the performance metrics, as his team was responsible for tracking providers' performance under the metrics, evaluating the efficacy of the metrics, and recommending changes to the metrics.

82.    Mr. Rivera resigned from his employment with Elevance Health Puerto Rico in September 2025. Shortly thereafter, he began employment with Triple-S as its Senior Vice President of Health System Finance.

83.    In this new role at Triple-S, Mr. Rivera oversees the financial operations, reporting, and governance of Triple-S's clinical operations. Mr. Rivera focuses on internal financial management, budgeting, forecasting, and process optimization, which duties closely mirror those he performed for Elevance Health Puerto Rico.

84.    Mr. Rivera's employment with Triple-S is both (i) a Competitive Position within the Restricted Territory for a Competitor; and (ii) a Restricted Activity within the Restricted Territory for a Competitor, resulting in independent material breaches of § 7(b) of the Agreements.

85.    First, Mr. Rivera's work for Triple-S is a "Competitive Position" because it is a position of employment with a Competitor where he performs the "same or similar services" to what he performed for Elevance Health in the last 24 months prior to his resignation. *Id.*

86.    In Mr. Rivera's new position with Triple-S, he is performing all or substantially all of the same functions he performed for Elevance Health Puerto Rico.

87.    Second, Mr. Rivera's work for Triple-S is also a "Competitive Position" for the independent reason that it is a position of employment with a Competitor where Dr. Ríos is likely to use Elevance Health's Confidential Information. *Id.*

88.    Moreover, by serving as a senior executive for Triple-S, Mr. Rivera is engaging in a Restricted Activity because he is engaging in activities for which he "had responsibility for [Elevance Health Puerto Rico]" and "about which [he] had Confidential Information within the Look Back Period." *See* Ex. A, § 7(b)(iii).

89.    Furthermore, Mr. Rivera's obtaining of the Competitive Position and performance of the Restricted Activity are both occurring within the Restricted Territory – Puerto Rico.

90.    Considering Mr. Rivera's position within Elevance Health Puerto Rico and his access to Elevance Health's confidential information, his employment with Triple-S presents a significant threat of unfair competition, which is the very threat Elevance Health sought to address in the Agreements through the restrictions in Section 7.

91.    During his employment, Mr. Rivera received 15 separate equity awards from Elevance Health, three in 2021, three in 2022, three in 2023, three in 2024, and three in 2025.

92.    During his employment with Elevance Health Puerto Rico, Mr. Rivera received more than $87,637.72 in equity awards, which were provided as an incentive to prevent Mr. Rivera from unfairly competing with Elevance Health for 12 months after the termination of his employment.

93.    Elevance Health made good-faith efforts to resolve this dispute by communicating in writing with Mr. Rivera on more than one occasion; those efforts were unsuccessful.

94.     Pursuant to Section 8(a)(iii) of the Agreements, Mr. Rivera must repay and reimburse Elevance Health the following amounts, which represent the RSUs and PSUs in which he vested during the 24 months immediately preceding his breach of Section 7(b):

| Restricted Stock Units (RSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 9/1/2021 | 9/3/2024 | 21 | $562.29 | $11,808.09 |
| 3/1/2022 | 3/1/2024 | 17 | $499.11 | $8,484.87 |
| 3/1/2022 | 3/1/2025 | 17 | $395.50 | $6,723.50 |
| 3/1/2023 | 3/1/2024 | 16 | $499.11 | $7,985.76 |
| 3/1/2023 | 3/1/2025 | 16 | $395.50 | $6,328.00 |
| 3/1/2024 | 3/1/2025 | 22 | $395.50 | $8,701.00 |
| | | | | |
| | | | Total (RSUs) | $50,031.22 |

| Performance Stock Units (PSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 9/1/2021 | 9/3/2024 | 50 | $562.29 | $28,114.50 |
| 3/1/2022 | 3/1/2025 | 24 | $395.50 | $9,492.00 |
| | | | Total (PSUs) | $37,606.50 |

95.     On December 5, 2025, Elevance Health sent a letter to Mr. Rivera requesting said payment within a ten (10) day period. As of the filing of this Complaint, however, Mr. Rivera has not made any payment of the amounts owed pursuant to Section 8 of the Agreements.

96.     Mr. Rivera's actions constitute clear, deliberate, and intentional violations of the contractual obligations he assumed under the Agreements. This breach not only demonstrates a conscious disregard for the agreed terms but also evidences conduct aimed at unfairly gaining a competitive advantage to the direct detriment of Elevance Health.

**E. Dr. Ramos's Employment with Elevance Health Puerto Rico and Subsequent Breach of Her Agreements.**

97.     Dr. Ramos was employed by Elevance Health Puerto Rico beginning July 2018, and her last position held was Director of Pharmacy Operations.

98.     In this role she managed pharmacy operations and implemented policies and

procedures under the guidance of the Staff Vice President.

99.    Dr. Ramos was a talented and promising executive at Elevance Health Puerto Rico and was being considered for a Staff Vice President role prior to her resignation.

100.    Dr. Ramos resigned from her employment with Elevance Health Puerto Rico in September 2025. Shortly thereafter, she began employment with Triple-S as its Vice President of Pharmacy Development.

101.    In this new role, Dr. Ramos is performing duties like those she performed for Elevance Health Puerto Rico. For example, both her old role at Elevance Health Puerto Rico and her new role at Triple-S involve overseeing pharmacy operations in Puerto Rico.

102.    Dr. Ramos's employment with Triple-S is both (i) a Competitive Position within the Restricted Territory for a Competitor; and (ii) a Restricted Activity within the Restricted Territory for a Competitor, resulting in independent material breaches of § 7(b) of the Agreements.

103.    Dr. Ramos's work for Triple-S is a "Competitive Position" because it is a position of employment with a Competitor where she performs the "same or similar services" to what she performed for Elevance Health in the last 24 months prior to her resignation. (*Id.*)

104.    In Dr. Ramos's new position with Triple-S, she is performing all or substantially all the same functions she performed for Elevance Health Puerto Rico.

105.    Moreover, by serving as an executive for Triple-S, Dr. Ramos is engaging in a Restricted Activity because she is engaging in activities for which she "had responsibility for [Elevance Health Puerto Rico]" "within the Look Back Period." *See* Ex. A, § 7(b)(iii).

106.    Furthermore, Dr. Ramos's obtaining of the Competitive Position and performance of the Restricted Activity are all occurring within the Restricted Territory – Puerto Rico.

107.    Considering Dr. Ramos's position within Elevance Health Puerto Rico and her access to Elevance Health's confidential information, her employment with Triple-S presents a threat of unfair competition, which is the very threat Elevance Health sought to address in the Agreements through the restrictions in Section 7.

108.    Additionally, during her employment with Elevance Health Puerto Rico Dr. Ramos received more than $4,365.68 in equity awards, which were provided as an incentive to prevent Dr. Ramos from unfairly competing with Elevance Health for 12 months after the termination of her employment.

109.    Elevance Health made good-faith efforts to resolve this dispute by communicating in writing with Dr. Ramos; those efforts were unsuccessful.

110.    Pursuant to Section 8(a)(iii) of the Agreements, Dr. Ramos must repay and reimburse Elevance Health the following amounts, which represent the RSUs in which she vested during the 24 months immediately preceding her breach of Section 7(b):

| Restricted Stock Units (RSUs) | | | | |
|---|---|---|---|---|
| Grant Date | Vesting Date | Shares Vested | Share Price at Vesting | Amount Realized |
| 3/1/2024 | 3/1/2025 | 11 | $396.88 | $4,365.68 |

111.    On January 9, 2026, Elevance Health sent a letter to Dr. Ramos requesting said payment within a ten (10) day period. As of the filing of this Complaint, however, Dr. Ramos has not made any payment of the amounts owed pursuant to Section 8 of the Agreements.

112.    Dr. Ramos's actions constitute clear, deliberate, and intentional violations of the contractual obligations she assumed under the Agreements. This breach not only demonstrates a conscious disregard for the agreed terms but also evidences conduct aimed at unfairly gaining a competitive advantage to the direct detriment of Elevance Health.

**COUNT I**
**Breach of Contract**
**(Against Dr. Ríos)**

114.    Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

115.    The Agreements are valid and enforceable contracts between Elevance Health and Dr. Ríos.

116.    Elevance Health and Dr. Ríos exchanged adequate and sufficient consideration in connection with the Agreements.

117.    Elevance Health duly performed its obligations under the Agreements.

118.    Dr. Ríos is in material breach of § 7(b) by obtaining a Competitive Position for a Competitor in the Restricted Territory within the 12-month Restriction Period, for the reasons set forth above.

119.    Dr. Ríos is in material breach of § 7(b) of the Agreements for the independent reason that, within the 12-month Restriction Period, he has performed and is performing a Restricted Activity in the Restricted Territory for a Competitor, for the reasons set forth above.

120.    Dr. Ríos is in material breach of § 8(a)(iii) of the Agreements by failing to repay the value of the equity awards provided to him under the Agreements, for the reasons set forth above.

121.    Because of Dr. Ríos's material breach, Elevance Health is suffering and shall continue to suffer significant monetary harm.

122.    Elevance Health is entitled to the return and repayment of all equity awards granted to Dr. Ríos pursuant to Section 8(a)(iii) of the Agreements, including but not limited to: payment from Dr. Ríos to Elevance Health of an amount equal to (A) for each share of common stock of Elevance Health acquired on exercise of an option within the 24 months prior to Dr.

Ríos's breach, the excess of the fair market value of a Common Share on the date of exercise over the exercise price, and (B) for each share of restricted stock, restricted stock unit and/or performance stock unit that became vested within the 24 months prior to Dr. Ríos's breach, the fair market value (on the date of vesting) of a Common Share.

123.    Under § 9(e) of the Agreement, Elevance Health is entitled to the recovery of its reasonable attorneys' fees and expenses, incurred in bringing this action to enforce its rights.

## COUNT II
### Breach of Contract
### (Against Dr. Guardiola)

124.    Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

125.    The Agreements are valid and enforceable contracts between Elevance Health and Dr. Guardiola.

126.    Elevance Health and Dr. Guardiola exchanged adequate and sufficient consideration in connection with the Agreements.

127.    Elevance Health duly performed its obligations under the Agreements.

128.    Dr. Guardiola is in material breach of § 7(b) by obtaining a Competitive Position for a Competitor in the Restricted Territory within the 12-month Restriction Period, for the reasons set forth above.

129.    Dr. Guardiola is in material breach of § 7(b) of the Agreements for the independent reason that, within the 12-month Restriction Period, he has performed and is performing a Restricted Activity in the Restricted Territory for a Competitor, for the reasons set forth above.

130.    Dr. Guardiola is in material breach of § 8(a)(iii) of the Agreements by failing to repay the value of the equity awards provided to him under the Agreements, for the reasons set forth above.

131.    Because of Dr. Guardiola's material breach, Elevance Health is suffering and shall continue to suffer significant monetary harm.

132.    Elevance Health is entitled, under Section 8(a)(iii) of the Agreements, to the return and repayment of all equity awards granted to Dr. Guardiola, including payment by Dr. Guardiola to Elevance Health of an amount equal to the fair market value (on the vesting date) of a Common Share for each share of restricted stock, restricted stock unit, and performance stock unit that vested within the 24 months preceding his breach.

**133.**    Under § 9(e) of the Agreement, Elevance Health is entitled to the recovery of its reasonable attorneys' fees and expenses, incurred in bringing this action to enforce its rights.

## COUNT III
## Breach of Contract
## (Against Mr. Rivera)

134.    Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

135.    The Agreements are valid and enforceable contracts between Elevance Health and Mr. Rivera.

136.    Elevance Health and Mr. Rivera exchanged adequate and sufficient consideration in connection with the Agreements.

137.    Elevance Health duly performed its obligations under the Agreements.

138.    Mr. Rivera is in material breach of § 7(b) by obtaining a Competitive Position for a Competitor in the Restricted Territory within the 12-month Restriction Period, for the reasons set forth above.

139.    Mr. Rivera is in material breach of § 7(b) of the Agreements for the independent reason that, within the 12-month Restriction Period, he has performed and is performing a Restricted Activity in the Restricted Territory for a Competitor, for the reasons set forth above.

140.    Mr. Rivera is in material breach of § 8(a)(iii) of the Agreements by failing to repay the value of the equity awards provided to him under the Agreements, for the reasons set forth above.

141.    Because of Mr. Rivera's material breach, Elevance Health is suffering and shall continue to suffer significant monetary harm.

142.    Elevance Health is entitled, under Section 8(a)(iii) of the Agreements, to the return and repayment of all equity awards granted to Mr. Rivera, including payment by Mr. Rivera to Elevance Health of an amount equal to the fair market value (on the vesting date) of a Common Share for each share of restricted stock, restricted stock unit, and performance stock unit that vested within the 24 months preceding his breach.

143.    Under § 9(e) of the Agreement, Elevance Health is entitled to the recovery of its reasonable attorneys' fees and expenses, incurred in bringing this action to enforce its rights.

**COUNT IV**
**Breach of Contract**
**(Against Dr. Ramos)**

144.    Elevance Health incorporates the allegations of the foregoing paragraphs above as though fully set forth herein.

145.    The Agreements are valid and enforceable contracts between Elevance Health and Dr. Ramos.

146.    Elevance Health and Dr. Ramos exchanged adequate and sufficient consideration in connection with the Agreements.

147.    Elevance Health duly performed its obligations under the Agreements.

148.    Dr. Ramos is in material breach of § 7(b) by obtaining a Competitive Position for a Competitor in the Restricted Territory within the 12-month Restriction Period, for the reasons set forth above.

149.    Dr. Ramos is in material breach of § 7(b) of the Agreements for the independent reason that, within the 12-month Restriction Period, she has performed and is performing a Restricted Activity in the Restricted Territory for a Competitor, for the reasons set forth above.

150.    Dr. Ramos is in material breach of § 8(a)(iii) of the Agreements by failing to repay the value of the equity awards provided to her under the Agreements, for the reasons set forth above.

151.    Because of Dr. Ramos's material breach, Elevance Health is suffering and shall continue to suffer significant monetary harm.

152.    Elevance Health is entitled, under Section 8(a)(iii) of the Agreements, to the return and repayment of all equity awards granted to Dr. Ramos, including payment by Dr. Ramos to Elevance Health of an amount equal to the fair market value (on the vesting date) of a Common Share for each share of restricted stock, restricted stock unit, and performance stock unit that vested within the 24 months preceding her breach.

153.    Under § 9(e) of the Agreement, Elevance Health is entitled to the recovery of its reasonable attorneys' fees and expenses, incurred in bringing this action to enforce its rights.

**RELIEF REQUESTED**

WHEREFORE, Elevance Health, Inc. requests the following relief:

A.      Entry of judgment in favor of Elevance Health on Count I-IV;

B.      An award of damages against each of the Former Executives individually for breach of their respective Agreements, for the repayment of all amounts required under Section 8(a)(iii);

C.      An award to Elevance Health of its actual costs and expenses incurred in connection with this proceeding, including but not limited to its costs and reasonable attorney's fees, pursuant to the terms of the Agreements, including Section 9(e); and

E.      An award of pre- and post-judgment interest at the statutory rate; and

F.      Any other such further relief that the Court deems appropriate.


ELEVANCE HEALTH, INC.


By /s/ Mark D. Kundmueller
         Of Counsel

Mark D. Kundmueller, Esq.
IN Bar No. 28427-71
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
E-mail: mark.kundmueller@troutman.com
         *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 29th day of January, 2026, I electronically filed the foregoing *Complaint* with the Clerk of Court using the CM/ECF system, and mailed via Federal Express to the following:

Dr. Waldemar Rios
22 Sunset Boulevard
Urb Carmen Hills
San Juan, PR  00926

Mr. Jaime Rivera Pesante
1500 Ave. Los Romeros, Apt. 415
San Juan, PR 00926

Benjamin Guardiola
2209 Cond Vista Real II
Caguas, PR 00727-7853

Sara M. Ramos Gonzalez, PharmD
Urb La Cumbre
Calle Rio Grande 322
San Juan, PR 00926

/s/ *Mark D. Kundmueller*
Mark D. Kundmueller, Esq.
IN Bar No. 28427-71

323858565